IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANIEL G. YACKAMOVICH,

               Plaintiff,

    v.

JOHN C. THOMAS, et al.,

               Defendants.

CIVIL ACTION
NO. 17-4085

**<u>OPINION</u>**

**Slomsky, J.**　　　　　　　　　　　　　　　　　　　　　　**February 15, 2022**

## I.　INTRODUCTION

    Daniel G. Yackamovich filed this civil rights action pursuant to 42 U.S.C. § 1983, claiming that he was the victim of the use of excessive force by correctional officers at a prison, which violated his constitutional rights under the Eighth and Fourteenth Amendments.　In response, Defendant Correctional Officer Thomas Privott claims that he is not liable because he is covered by qualified immunity.　Before the Court is a Motion for Summary Judgment (Doc. No. 82) filed by Correctional Officer Privott, and Plaintiff's Response in Opposition (Doc. No. 88).　For reasons that follow, Defendant's Motion for Summary Judgment (Doc. No. 82) will be denied.

## II.　BACKGROUND

### A.　Factual Background

    Plaintiff's claim, filed pursuant to 42 U.S.C. § 1983, arises out of events that occurred on December 11, 2015, while he was a convicted inmate at the State Correctional Institution in Chester, Pennsylvania ("SCI-Chester").　(See Doc. Nos. 28 at 3, 88-2 at 10.)　Defendant

Correctional Officer Privott ("Privott"), the only remaining named Defendant in this case,[1] worked at the prison while Plaintiff was incarcerated.  On December 11, 2015, Plaintiff was packing belongings in his cell before relocating to the prison's Restricted Housing Unit.  (Doc. No. 82-2 at 1, 88 at 7.)  While he was packing, a correctional officer, Lieutenant Williams, ordered Plaintiff to place a Russian flag in his cell into the garbage.  (Doc. No. 28 at 3, 82-2 at 1.)  Plaintiff told Williams that he "would do no such thing because the flag represents [his] heritage," and Yackamovich and Williams began to "verbally argue back and forth about [the] flag."  (Doc. No. 8 at 6, 82-2 at 1.)  After this exchange, Defendant Privott came on the scene and he too ordered Plaintiff to throw away the flag.  (Doc. Nos. 28 at 3, 82-2 at 1.)

When Yackamovich still refused to dispose of the flag, an argument ensued between Plaintiff and Privott.  (Doc. Nos. 28 at 4, 82-2 at 1.)  According to Plaintiff, Privott warned him that if he did not throw the flag away, "he was going to split [Plaintiff's] [r]acist head open."[2] (Doc. No. 8 at 7.)  Another correctional officer arrived on the scene and told Plaintiff to get on his knees, face the window, and place his hands on top of his head.  (Doc. Nos. 8 at 7, 82-2 at 1– 2.)  Plaintiff complied with the order, "was handcuffed with a guard holding each arm," and was escorted out of the cell.  (Doc. Nos. 8 at 7, 28 at 4, 82-2 at 2.)  The parties do not dispute that Plaintiff complied with the order and was handcuffed prior to the use of the alleged excessive force.  (See Doc. Nos. 82-3 at 2, 88 at 7.)

---

[1]   Defendant "Correctional Officer John Doe" also remains on the docket, but his or her identity is unknown.

[2]   Plaintiff repeated this assertion at his deposition, where he testified that Privott "made a statement" that he "would love to crack [Yackamovich's] Russian racist head." (Doc. No. 88-2 at 29.)

The events that followed, however, are contested by the parties.  Importantly, the parties dispute what prompted the alleged application of excessive force by Defendant, and what was said between Plaintiff and Defendant Privott prior to the incident.  According to Plaintiff, Defendant Privott "made a deragotory [sic] comment about Russians in general."  (Doc. No. 8 at 7.)  Notably, Yackamovich denies saying or doing anything inflammatory in response to the alleged comment of Privott.  At his deposition, Plaintiff asserted the following:

> Q: And then— and then what happened—when you turned around towards Officer —Correctional Officer Privott, did you say anything to him?
>
> A. No, I turned around . . . I remember what I was going to say, what did you call me what I was going to say and that's when the first blow from the baton came.
>
> Q. But you—
>
> A. Immediately after that when I went to say that to him, that's when the first blow from the baton landed on my left side of my head above my eye.
>
> Q. So when you—when you turned around did you make any gestures [like] lunging towards?
>
> A. No.
>
> Q. During this whole period of time . . . did you make any derogative, negative—
>
> A. No.
>
> Q. —anything other than a positive remark to Lieutenant Williams?
>
> A: No.
>
> Q: And during this whole entire time did you ever threaten to kill any of the correction[al] officers?
>
> A: No.

(Doc. No. 88-2 at 28–29.)

Defendant Privott tells a different version of events.  According to Defendant, as Plaintiff was being led from his cell, he "turned around, attempted to head[-]butt and spit on the officers

and stated, 'I'm going to blow your f****** head off, f****** n*****.'"  (Doc. No. 82-2 at 8.)

Additionally, Defendant refers to the investigation of the incident by the Commonwealth of

Pennsylvania Department of Corrections, where a disciplinary hearing examiner found the

following:

> Yackamovich assaulted staff, threatened an employee or their family w/ bodily
> harm, threatened another person and used abusive, obscene or inappropriate
> language to an employee by attempting to head[-]butt and spit on the officer and
> stated, "I'm going to blow your f****** head off, f******* n*****."

(Doc. No. 15 at 13.)  The disciplinary hearing officer found Plaintiff guilty of four charges.  (See

id.)  Based on the above facts and the findings of the disciplinary hearing officer, Defendant argues

that the actions he and the other correctional officers took against Plaintiff were due to his "verbally

and physically combative nature."  (Doc. No. 82-3 at 8.)

The amount of force applied is also disputed.  The parties agree that Privott struck Plaintiff,

at least twice, with a baton.  (Doc. Nos. 28 at 4, 82-2 at 2.)  Plaintiff asserts, however, that

Defendant struck him "with his batton [sic] on top of [his] head once, twice and then I believe

three times until [he] was rendered unconscious."  (Doc. No. 8 at 7.)  In his original Complaint

(Doc. No. 8), Plaintiff alleges that Defendant struck him "more times in [his] th[igh], buttocks, leg

area, while handcuffed behind [his] back, while still unconscious showing no resistance."[3]  (Doc.

No. 8 at 7.)  Further, the First Amended Complaint alleges that Privott "hit and beat [him] with a

baton multiple times for no reason whatsoever."  (Doc. No. 28 at 4.)  At his deposition, Plaintiff

recalled that Defendant hit him with a baton at least three times.  (See Doc. No. 88-2 at 14.)  In

---

[3]   Although these allegations are in Plaintiff's first Complaint (Doc. No. 8), "[a] superseded
pleading may be offered as evidence rebutting a subsequent contrary assertion" at the summary
judgment stage.  W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank, 712 F.3d 165,
173 (3d Cir. 2013).  "For example, at the summary judgment stage, a district court may consider
a statement or allegation in a superseded complaint as rebuttable evidence when determining
whether summary judgment is proper."  Id. (citation omitted).

contrast, Defendant contends that he only struck Plaintiff twice with the baton and did not kick or strike Plaintiff in his thigh, buttocks, or leg area.  (Doc. No. 82-3 at 2.)

The parties also dispute the injuries suffered by Plaintiff.  After the incident, Plaintiff was escorted to the Restrictive Housing Unit.  (Doc. No. 82-3 at 2.)  Nurse Lovelace Acquaye, a Registered Nurse ("RN"), performed an assessment of Plaintiff.  (See id.)  Yackamovich recalls that during the examination, he "complained of injuries to his head and lower back."  (Doc. No. 88 at 8.)  At his deposition, Yackamovich recounted the following during his examination by Nurse Acquaye:

> Q:  So you said you were complaining about [how] you were dizzy and you're having—you were seeing white flashes.  Did you make any other complaints to [Nurse Acquaye]?
>
> A:  And my back.
>
> Q:  You told her that your back hurt?
>
> A:  Yes, my back.
>
> Q:  What part of your back hurt?
>
> A:  In the middle of my back.

(Doc. No. 88-2 at 30.)  Plaintiff further testified that the incident caused him to have headaches, which he still suffers from, and that his back pain persists in that "[i]t's sharp at times and then sometimes it's an ache [that is] sharp, like a knife and then an ache."  (Id. at 31.)  Additionally, Plaintiff testified at his deposition that he continues to suffer from "severe back pain . . . sleep deprivation as well as depression . . . and PTSD [Post-Traumatic Stress Disorder]."  (Id. at 7.)  Defendant, in opposition, cites to progress notes taken by Nurse Acquaye on the day of the incident, where she noted that Yackamovich "refused all medical care, stating 'I'm fine and

everything is good.'"  (See Doc. Nos. 82-3 at 2, 83-2 at 2.)  Nurse Acquaye also wrote, "No injury noted, he appears stable."  (Doc. No. 83-2 at 2.)

Further, a video of the alleged incident exists.  (See Doc. No. 86.)  Its authenticity is undisputed by the parties, and both assert that the video supports their versions of the facts alleged. (See Doc. Nos. 82-3 at 2, 88 at 10.)

### B.  Procedural Background

On October 30, 2017, Yackamovich filed a Complaint pro se.  (Doc. No. 8.)  On March 2, 2018, Plaintiff filed an amended complaint ("First Amended Complaint") after obtaining counsel to represent him in this case.  (Doc. No. 28.)  The First Amended Complaint asserts § 1983 claims of excessive force by Defendant Privott ("Count I"), failure to intervene by Defendants Williams and Doe ("Count II") under the Eighth and Fourteenth Amendments,[4] and assault and battery under Pennsylvania Law by Defendant Privott ("Count III").  (See Doc. No. 28 at 5–8.)  On October 4, 2021, Plaintiff voluntarily filed the Motion to Dismiss Defendant Williams (Doc. No. 98), which the Court granted (Doc. No. 100).

On July 23, 2021, Defendant Privott filed the instant Motion for Summary Judgment (Doc. No. 82) on Counts I and III of Plaintiff's Amended Complaint (Doc. No. 28), and on August 2, 2021, Plaintiff filed a Response in Opposition (Doc. No. 88).  The matter is now fully briefed and ripe for disposition.

### III.  STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  In reaching this decision,

---

[4]   Count II is no longer at issue, due to the dismissal of Defendant Williams and the failure to identify Defendant Doe.

the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata, 511 F. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  Anderson, 477 U.S. at 247–49.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party.  Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

One of the things a court may consider in determining whether a genuine dispute of material facts exists is video evidence of the events at issue.  In a case where video evidence of the events exists, a court must view the facts "in the light depicted by the video."  Scott v. Harris, 550 U.S. 372, 381 (2007) (holding officer did not violate Fourth Amendment by viewing the facts in the light depicted by the videotape of the incident).  A court "need not adopt the non-movant's version of the facts if the recording 'blatantly contradict[s]' the non-movant's version 'so that no reasonable jury could believe it.'"  McDowell v. Sheerer, 374 F. App'x 288, 292 (3d Cir. 2010) (citing Scott, 550 U.S. at 380).  "Where a videotape refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate."  Smalls v. Sassaman, No. 17-2237, 2019 WL 4194211, at *8 (M.D. Pa. Sept. 4, 2019) (citing Tindell v. Beard, 351 F. App'x 591 (3d Cir. 2009)).  See also McCullon v. Saylor, No. 12-445, 2013 WL 1192778, at *14 (M.D. Pa. Mar. 4, 2013) ("[W]hen videotape refutes an inmate's assertion that defendants used excessive force or when the video shows that an inmate did not suffer any physical distress, and a medical report indicates that he had no visible swelling or injuries," a court may enter summary judgment on an excessive force claim.) (internal quotation marks omitted).

Qualified immunity is an affirmative defense.  Sharp v. Johnson, 669 F.3d 144, 158 (3d Cir. 2012).  "[A]ffirmative defenses may be raised at any time, even after trial, so long as the plaintiff suffers no prejudice."  Id.  A movant asserting an affirmative defense at the summary judgment stage has the burden of proof on that defense.  See Richard B. Roush, Inc., Profit Sharing Plan v. New England Mut. Life Ins. Co., 311 F.3d 581, 585 (3d Cir. 2002).

## IV.     ANALYSIS

Plaintiff has filed suit under 42 U.S.C. § 1983 for violations of his Eighth and Fourteenth Amendment rights.  He contends that Defendant Privott violated his constitutional rights by using excessive force.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.

To recover under § 1983, a plaintiff must establish that defendants, "acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury."  Black v. Montgomery County, 835 F.3d 358, 364 (3d Cir. 2016) (quoting Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005)), cert. denied sub nom. Pomponio v. Black, 137 S. Ct. 2093 (2017) (mem).  Section 1983 "is not a source of substantive rights but rather a mechanism to vindicate rights afforded by the Constitution or a federal statute."  Id. (citing Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).

Given these basic precepts, the Court will first assess Plaintiff's Eighth and Fourteenth Amendment claims pursuant to § 1983.[5]  Second, the Court will analyze Defendant's affirmative

---

[5]   The "Due Process Clause [of the Fourteenth Amendment] affords [Plaintiff] no greater protection than does the Cruel and Unusual Punishments Clause."  Whitley v. Albers, 475 U.S. 312, 327 (1986).  Thus, the Court's analysis of Plaintiff's claims under both Amendments will be achieved by solely performing an Eighth Amendment analysis.  When a complaint alleges violations of the Eighth and Fourteenth Amendments, the latter does not provide a distinct form of substantive protection, as the United States Supreme Court held in Whitley:

> We think the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified.  It would indeed be surprising if, in the context of forceful prison security measures, "conduct that shocks the conscience" or "afford[s] brutality the cloak of law," and

defense of qualified immunity.  Finally, the Court will conclude that, due to several remaining issues of material fact, granting summary judgment in favor of Defendant at this juncture is not warranted.

**A. Defendant is not entitled to summary judgment on Plaintiff's Eighth Amendment excessive force claim.**

**1. Eighth Amendment Excessive Force**

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST. amend. VIII.  Hence, the Eighth Amendment protects prisoners from cruel and unusual punishment.  Allah v. Ricci, 532 Fed. App'x. 48, 50–51 (3d Cir. 2013).  The Eighth Amendment is the primary vehicle for an inmate to challenge the use of excessive and unjustified force by a prison official.  Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (citing Whitley v. Albers, 475 U.S. 312, 327).  "[T]he question [of] whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Hudson v. McMillian, 503 U.S. 1, 6 (1992) (citations and internal quotation marks omitted).

---

so violates the Fourteenth Amendment, Rochin v. California, 342 U.S. 165, 172, 173 (1952), were not also punishment "inconsistent with contemporary standards of decency" and "'repugnant to the conscience of mankind,'" Estelle v. Gamble, 429 U.S. at 103, 106, in violation of the Eighth.  We only recently reserved the general question "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." Daniels v. Williams, 474 U.S. 327, 334 n.3 (1986).  Because this case involves prison inmates rather than pretrial detainees or persons enjoying unrestricted liberty we imply nothing as to the proper answer to that question outside the prison security context by holding, as we do, that in these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause.

Id. at 327 (citation format altered).

Prison officials are to be afforded deference in their decisions to maintain order and security in the prison.  See Bell v. Wolfish, 441 U.S. 520, 547 (1979).  This deference, however, "does not insulate from review actions taken in bad faith and for no legitimate purpose."  Whitley, 475 U.S. at 322.  To determine whether a correctional officer used excessive force in violation of the Eighth Amendment, the following factors are considered:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000).

While the extent of the injuries suffered by the prisoner is relevant to a determination of whether the force used was excessive, the fact that a prisoner's injuries may be considered "minor," however, does not by itself preclude an Eighth Amendment claim.  Brooks v. Kyler, 204 F.3d 102, 104 (3d Cir. 2000).  The Supreme Court has noted:

> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.  An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.

Wilkins v. Gaddy, 559 U.S. 34, 38 (2010).  The Third Circuit echoed this holding in Brooks v. Kyler, noting:

> Requiring objective or independent proof of minor or significant injury, would . . . place protection from injury, instead of protection from wanton force, at the hub of the Eighth Amendment.  This is not to say, as the Hudson court observed, that the degree of resulting injury is not highly relevant to the determination of the unreasonableness of the force used; rather, it merely says that the absence of objective proof of non-de minimis injury does not alone warrant dismissal.  If we were to adopt the District Court's reasoning, a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis.

F.3d at 108 (citing <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992)) (internal citations and quotation marks omitted).

Hence, while the injuries suffered by an excessive force claimant are "highly relevant," summary judgment should not be granted solely because the claimant does not have proof that he or she suffered an injury that was more than <u>de minimis</u>. <u>Id.</u>; <u>see</u> <u>also</u> <u>Hudson</u>, 503 U.S. at 7 ("The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it."). As the court in <u>Brooks</u> concluded, "regardless of the category of the injury, [the claimant] adduced evidence of the use of wanton, unnecessary force resulting in severe pain. This creates a disputed issue of material fact for the trier of fact to resolve." <u>Id.</u> at 109.

**2. There are several issues of material fact that are crucial to the Eighth Amendment excessive force analysis.**

Here, a genuine dispute of material fact remains regarding three important areas: first, whether Yackamovich made statements or performed threatening actions toward Defendant and the other officers; second, the extent of the force used by Privott; and third, the injuries inflicted as a result of the events alleged.

**a. Need for Use of Force at Issue**

Regarding whether there was a need for the use of force, Plaintiff asserts, pointing to his deposition testimony, that he did not say or do anything to elicit the force used by Privott. (See Doc. No. 88-2 at 28–29.) On the other hand, Defendant points to the findings of the disciplinary hearing officer and contends that Plaintiff threatened to kill him, used a racial slur, and attempted to head-butt and spit on him and other officers, rendering the use of force as reasonable "to protect himself and the other officers." (Doc. No. 82-3 at 8.)

This dispute lies at the heart of at least three of the factors set forth by the Third Circuit in <u>Brooks</u>: the need for the application of force; the relationship between the need and the amount of

force that was used; and the extent of the threat exhibited by Plaintiff to the safety of staff and inmates.  See Brooks, 204 F.3d at 106.  It is also crucial to note that the parties do not dispute that Plaintiff was already restrained and in handcuffs at the time of the alleged incident.  (See Doc. Nos. 82-3 at 2, 88 at 7.)  However, because more facts are needed to know whether Plaintiff posed a further threat to the correctional officers, this fact is relevant to, but not determinative of, whether Plaintiff was fully subdued at the time of the incident.

Also, viewing the facts "in the light depicted by the video," these disputes of material fact remain here.  Scott v. Harris, 550 U.S. 372, 381 (2007); see also Gillespie v. Pennsylvania State Police, No. 20-4948, 2021 WL 5755214, at *10–11 (summarizing Scott decision).  Most importantly, the surveillance video does not have sound, leaving unclear whether Plaintiff made any statements or threats that prompted the use of force against him.  (See Doc. No. 86.)  Further, the video is filmed at a distance.  (See id.)  It is impossible to detect whether Plaintiff spoke at all or made any threatening movements that may have reasonably prompted the use of force.  (See id.)  Although the video, at 6:07, vaguely shows Plaintiff turning toward the officers as he is being led away, this movement is consistent with both Plaintiff's and Defendant's versions of events. (See id.)  As Plaintiff asserts, he turned around and started to ask Privott what he had just said to him, which a reasonable juror could find does not give rise to the need for the use of force. (See Doc. No. 88-2 at 28–29.)  On the other hand, Defendant claims that Plaintiff threatened to kill him and attempted to head-butt and spit on him and the other officers, which a reasonable juror could find does give rise to the need for the use of force.  (See Doc. No. 82-3 at 8.)  It is unclear from the video what is the correct version of events, and a reasonable juror could find in favor of Plaintiff's version.

Therefore, summary judgment is inappropriate because a genuine dispute of material fact remains for the jury to decide, after assessing the evidence and the credibility of witnesses at trial, on whether Plaintiff said or did anything to give rise to the need for the use of force, which is crucial to the Eighth Amendment analysis.

### b. Extent of Force at Issue

Further, an issue of material fact remains as to the extent of force used by Privott. In his original Complaint (Doc. No. 8), Plaintiff states that Defendant not only hit him with a baton three times, but also continued to strike him in the thigh, buttocks, and leg area after he was unconscious. (See Doc. No. 8 at 7.) In his First Amended Complaint (Doc. No. 28), it is unclear whether Plaintiff intends to renew this assertion; nevertheless, he still alleges generally that Defendant "hit and beat [him] with a baton multiple times for no reason whatsoever." (Doc. No. 28 at 4.) Alternatively, Defendant argues, using the video as evidentiary support, that he only hit Plaintiff twice with a baton. (Doc. No. 82-3 at 8.) These issues of fact are material because of the need to assess, under Brooks, the relationship between the requirement for the amount of force that was used, and the extent of the injury inflicted.

The video evidence, however, does not cure this dispute of material fact. Although it can be determined from the video that Defendant struck Plaintiff with a baton at least twice, from 6:08–6:12, and that this striking caused Plaintiff to fall to the ground, nothing else is clear. (See Doc. No. 86.) In particular, what is missing from the video is whether Privott continued to strike Plaintiff after he was on the ground, and whether he was unconscious at any point. (See id.) As previously noted, the surveillance video was filmed at a considerable distance from the events alleged, and a clear view of Plaintiff and Defendant is obstructed by the many officers surrounding

them.  Thus, it is for the jury to decide on the amount of force used by Defendant against Plaintiff and whether it was excessive.

### c.  Plaintiff's Injuries at Issue

Finally, the injuries inflicted during the incident are disputed by the parties.  As discussed above, Plaintiff need not submit evidence of non-<u>de minimis</u> injury; however, the extent of Yackamovich's injuries is still "highly relevant" to the Eighth Amendment inquiry.  <u>Brooks</u>, 204 F.3d at 104.  Yackamovich said at his deposition that during the medical examination after the incident, he "complained of injuries to his head and lower back," as well as dizziness and seeing white flashes.  (Doc. Nos. 88-2 at 30–1.)

Defendant proffered evidence from the nurse who examined Plaintiff on the date of the incident.  She wrote that no injury was noted and that Plaintiff refused all medical care, stating that he was fine and "everything is good."  (<u>See</u> Doc. Nos. 82-3 at 2, 83-2 at 2.)  This evidence conflicts with Plaintiff's deposition testimony on his injuries.  Although Defendant argues, "as indicated by the video, Plaintiff walked down a set of stairs and off the block in no apparent distress," the video from 10:43 to 11:06 is again unclear as to Plaintiff's facial expressions and level of distress.  (Doc. No. 86.)  Furthermore, Plaintiff's emotions are not determinative of whether he sustained physical injuries.  Because a disputed issue of fact remains on his injuries, this further supports the denial of summary judgment.

Viewing the facts in a light most favorable to the Plaintiff, a reasonable jury could find an Eighth Amendment violation.  The Court therefore will deny summary judgment on Count I of the First Amended Complaint.

**B. Adopting Plaintiff's version of facts, granting summary judgment on the basis of qualified immunity is not warranted.**

Having concluded that triable issues of fact exist as to whether Defendant used excessive force on Plaintiff in violation of the Eighth Amendment, the Court will now determine whether Defendant is entitled to the affirmative defense of qualified immunity. "Qualified immunity protects a government official from liability for civil damages as long as his conduct did not violate clearly established rights of which a reasonable person would have known." Naisha v. Metzger, No. 20-3056, 2021 WL 5632063, at *2 (3d Cir. Dec. 1, 2021) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The qualified immunity analysis is two-fold, as a court must determine: (1) "whether the facts alleged by the plaintiff show the violation of a constitutional right;" and (2) "whether the law was clearly established at the time of the violation." Jefferson v. Lias, 21 F.4th 74, 80 (3d Cir. 2021) (citing Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010)).

**1. Defining the Constitutional Right at Issue**

In accordance with the two-part test set forth above, the Court will first examine whether a constitutional violation as alleged by Plaintiff actually exists. The Court should avoid defining the contours of a constitutional right "at a high level of generality." Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 638 (3d Cir. 2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). Put differently, the context of each case is crucial to defining the constitutional right at issue. See Sauers v. Borough of Nesquehoning, 905 F.3d 711, 719 (3d Cir. 2018). At the summary judgment stage, this "usually means adopting . . . the plaintiff's version of the facts," especially where a dispute of material fact remains. Scott v. Harris, 550 U.S. 372, 378 (2007). Broadly delineating the constitutional right, such as merely defining the constitutional right at issue in this case as "the Eighth Amendment right to be free from cruel and unusual punishment," would "convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability

16

simply by alleging violation of extremely abstract rights." <u>Spady</u>, 800 F.3d at 638 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987)).

The Court must define the right in the particularized sense "in light of the specific context of the case." <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). Adopting Plaintiff's version of the facts, the specific context of this case is an inmate who, while restrained in handcuffs and being escorted by correctional officers, was beaten with a baton until he was unconscious, despite him not verbally or physically posing a threat to the correctional officers. Thus, the Court considers the specific right in this case under the Eighth Amendment to be the right of an inmate to be free from gratuitous force when he has already been restrained and has not otherwise posed a threat to safety. A jury crediting Plaintiff's version of the facts could find that this constitutional right was violated by Defendant, satisfying the first prong of the qualified immunity inquiry.

### 2.   Whether the Right at Issue Was Clearly Established

Moving on to the second inquiry in the two-part test, the Court will examine whether this constitutional right was clearly established at the time of the incident, December 11, 2015. To determine whether a law was clearly established at the time of the alleged violation:

> We must ask we whether that right was "clearly established" at the time of its alleged violation, <u>i.e.</u>, whether the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is an objective (albeit fact-specific) question, where an officer's subjective beliefs . . . are irrelevant.

<u>Jefferson v. Lias</u>, 21 F.4th 74, 81 (3d Cir. 2021) (quoting <u>Peroza-Benitez v. Smith</u>, 994 F.3d 157, 165 (3d Cir. 2021) (citations and some quotations omitted)). And once a defendant raises the defense of qualified immunity, a plaintiff bears the initial burden of overcoming that defense by showing that the defendant violated the plaintiff's clearly established right. <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 399 (3d Cir. 1997). "Only if the plaintiff carries this initial burden must the

defendant then demonstrate that no genuine issue of material fact remains as to the "objective reasonableness" of the defendant's belief in the lawfulness of his actions."  Id.

Plaintiff has carried his burden by demonstrating that it is clearly established that, in the Eighth Amendment context, it is not objectively reasonable to beat an inmate when he has already been restrained and has not otherwise posed a threat to safety.  Plaintiff cites to a Third Circuit decision, Giles v. Kearney, which he notes held that "if true, testimony that [an] inmate 'was kicked in the ribs and punched in the head while restrained on the ground, after he ceased to resist' can establish an Eighth Amendment violation."  (Doc. No. 99 at 11 (citing Giles v. Kearney, 571 F.3d 318, 326, 328–29 (3d Cir. 2009))).  That decision was issued on July 15, 2009, which is before the date of the alleged incident here, December 11, 2015.  Giles is a Third Circuit decision which contains allegations and disputes of material fact that are similar to those in this case.  In Giles, the court determined that the district court erred in granting summary judgment on the basis of qualified immunity where there was a dispute of material fact regarding whether the plaintiff inmate was resisting the correctional officers at the time force was used.  See Giles, 571 F.3d at 327–28.  In doing so, the Third Circuit held:

> Because Giles testified that he was hit and kicked while restrained on the ground, after he ceased to resist, Giles alleges conduct by the officers in violation of his Eighth Amendment rights that a reasonable officer would have known was a violation under the circumstances.  No reasonable officer could agree that striking and kicking a subdued, non[-]resisting inmate in the side, with force enough to cause a broken rib and collapsed lung, was reasonable or necessary under established law.  Accordingly, because accounts of this critical event were controverted, on summary judgment it was improper to dismiss Giles' complaints against [the officers] on the basis of qualified immunity.

Giles, 571 F.3d at 328.  The Third Circuit defined the constitutional right at issue as "an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued," which it concluded was clearly established "at the time of the incident in 2001."  Id. at 326.  Here,

18

according to Plaintiff's set of facts, Yackamovich was also "a subdued, non[-]resisting inmate," and thus striking him with a baton until he was unconscious "for no reason whatsoever" is akin to the facts of Giles, and therefore would be a violation of clearly established law.  (See Doc. No. 28 at 4.)

Going further, Plaintiff notes decisions outside of the Third Circuit that hold a correctional officer may not use gratuitous force against an inmate who has been subdued or restrained. Plaintiff points to several cases from the United States Court of Appeals for the Fourth Circuit. Although only one decision was issued before 2015, all four dealt with underlying incidents that occurred in 2015 or earlier.  In each decision, the Fourth Circuit held that it was clearly established that a correctional officer may not use gratuitous force against a subdued or incapacitated prisoner. (See Doc. No. 88 at 12–13 (citing Iko v. Shreve, 535 F.3d 225 (4th Cir. 2008) (holding that deployment of pepper spray after inmate is lying on the floor restrained may give rise to inference that force was not employed protectively); Dean v. Jones, 984 F.3d 295 (4th Cir. 2021) ("[I]t is 'well-established . . . that officers may not use gratuitous force against a prisoner who has already been subdued [or] . . . incapacitated.'"); Brooks v. Johnson, 924 F.3d 104 (4th Cir. 2019) (reversing grant of summary judgment due to factual dispute and holding improper motive could be inferred from fact that inmate was subjected to taser shocks while "handcuffed and surrounded by officers"); Thompson v. Commonwealth of Virginia, 878 F.3d 89 (4th Cir. 2017) (holding officer not entitled to qualified immunity where genuine issue of material fact existed as to whether alleged force applied by officer, by driving van in an alleged punitive "rough ride," was used maliciously and sadistically to cause harm, which clearly established law prohibited).)  Thus, by invoking case law that demonstrates the constitutional right at issue was clearly established, Plaintiff has satisfied his burden.

The burden is now placed on Defendant to show that no genuine issue of material fact remains as to the "objective reasonableness" of Defendant's belief in the lawfulness of his actions. Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). This is a burden Defendant fails to meet. In support of his argument that he should be afforded qualified immunity, Privott contends that "Plaintiff cannot establish that it would be clear to a reasonable officer in Privott's position that applying a certain degree of force to gain control of Plaintiff[,] a confrontational, aggressive, combative inmate who was being escorted to the Restrictive Housing Unit is 'clearly unlawful.' Saucier, 533 U.S. at 201." (Doc. No. 82-3 at 11.) This assertion is entirely based upon Defendant's version of facts, the adoption of which is not appropriate at the summary judgment stage, as the Court has noted above.

Adopting Plaintiff's version of the facts and resolving any issue of material fact in favor of the Plaintiff, the Court will deny qualified immunity to Defendant at this point because it is clearly "established that an officer may not . . . use gratuitous force against an inmate who has been subdued." Giles, 571 F.3d at 327. Because the facts surrounding the incident remain controverted, this issue is for the jury.

### C. Defendant is not entitled to sovereign immunity at the summary judgment stage due to remaining issues of material fact.

Lastly, the Court will deny Defendant Privott's Motion for Summary Judgment on Count III, the state law claims for assault and battery. In his Motion (Doc. No. 82), Privott asserts the defense of sovereign immunity under Pennsylvania law. Congress did not abrogate the States' sovereign immunity when it enacted § 1983. Quern v. Jordan, 440 U.S. 332, 345 (1979). State law is determinative when assessing the scope of sovereign immunity. Gillespie v. Pennsylvania State Police, No. 20-4948, 2021 WL 5755214, at *13 (E.D. Pa. Dec. 3, 2021) (citing Lombardo v. Pennsylvania, Dep't of Pub. Welfare, 540 F.3d 190, 195 (3d Cir. 2008)).

In Pennsylvania, sovereign immunity will bar a claim against "a Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment." 42 PA. C. S. § 8501. Section 228 of the Restatement (Second) of Agency, adopted in Pennsylvania, provides:

> Conduct of [an employee] is within the scope of employment if, but only if:
>
> (a) It is of the kind he is employed to perform;
> (b) It occurs substantially within the authorized time and space limits;
> (c) It is actuated, at least in part, by a purpose to serve the [employer], and
> (d) If force is intentionally used by the [employee] against another, the use of force is not unexpectable by the [employer].

Justice v. Lombardo, 652 Pa. 588, 604 (citing Restatement (Second) of Agency § 228(1) (1958)). The Pennsylvania Supreme Court has long held that whether a particular act is within the scope of employment is a question of fact for the jury. Id. at 606 (citations omitted). The one exception is "where neither the facts nor the inferences to be drawn from them are in dispute." Id.

Here, there are several material facts that remain in dispute as to why Defendant Privott used force on Plaintiff. If Defendant struck Plaintiff with a baton until he was unconscious "for no reason at all," as Plaintiff asserts, he would not be acting within the scope of his employment. See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 757 (1998) (committing a tort while "[a]cting purely from personal ill will" is not within the scope of employment). For this reason, sovereign immunity at the summary judgment stage will be denied.

## V.    CONCLUSION

For the reasons stated above, Defendant Privott's Motion for Summary Judgment (Doc. No. 82) will be denied. An appropriate order follows.